F5154f.597
3:03/30/98

# AGREEMENT

This Agreement ("Agreement") is made ___APRIL 6___, 1998, by and between Provident Bank of Maryland ("PBM"), a Maryland chartered trust company with its principal office located at 114 East Lexington Street, Ninth Floor, Baltimore, Maryland 21202, and David McCarthy, 329 Warren Boulevard, Broomall, Pennsylvania 19008 ("Employee").

## Recitals

A. PBM wishes to establish an office equipment leasing subsidiary ("Leasing Co") and to engage Employee to serve as its President and Chief Executive Officer.

B. Employee wishes to serve as President and Chief Executive Officer of Leasing Co.

NOW, THEREFORE, in consideration of the Recitals, and other good and valuable consideration, the receipt and sufficiency of which the parties acknowledge, the parties agree as follows:

1. **Leasing Co.**

    1.1. PBM will create Leasing Co which will be a Maryland corporation wholly owned by PBM. PBM will capitalize Leasing Co with an initial investment of $500,000. Capitalization will be evaluated 6 months after creation and PBM will provide additional capital, if necessary in PBM's judgment, up to a total PBM investment of $1.5 million. Leasing Co's principal office will be located in suburban Philadelphia and business will be conducted primarily in Pennsylvania, although Leasing Co may conduct business in other states. Leasing Co's board of directors initially will be comprised of Employee, Peter M. Martin, James R. Wallis and John F. Novak.

    1.2. Leasing Co will satisfy all of its financing needs through PBM unless PBM approves other relationships and PBM will purchase all leases generated by Leasing Co. PBM will lend to Leasing Co at an interest rate equal to the same cost of funds rate charged to PBM's Consumer Lending Division for transactions with similar maturities, all as determined by PBM's treasurer. PBM will review securitization and portfolio sales as needed. Leasing Co shall implement internal controls and a general ledger interface satisfactory to PBM.

    1.3. PBM will provide Leasing Co with a pricing list for certain back office services PBM makes available. Leasing Co may purchase such services from PBM or from outside vendors, at Leasing Co's discretion. Leasing Co may have access to PBM's intranet for e-mail and other services at a cost to be determined by PBM and Leasing Co.

F5154t.597
3:03/30/98

2.  **Employment.**

2.1.  Leasing Co will employ Employee and Employee agrees to serve as its President and Chief Executive Officer. Employee agrees to devote his full time and best efforts to the satisfactory performance of such services and duties as the Board of Directors of Leasing Co establishes from time to time. Employee's employment is subject to the policies of Leasing Co set by Leasing Co's Board of Directors from time to time.

2.2.  Employee represents to Leasing Co that the execution and performance by Employee of this Agreement and his employment will not breach or be a default under any other agreement by which Employee is bound.

2.3.  Employee's employment will officially commence ("Commencement Date") when PBM receives all necessary regulatory approvals for the establishment of Leasing Co, without conditions considered burdensome by PBM in its sole discretion, and Leasing Co receives all necessary licenses to conduct its business, or such later date as PBM and Employee mutually agree.

2.4.  Subject to PBM's Lending Approval Matrix (which applies to all PBM loan officers), Employee will have credit approval authority up to $250,000.

3.  **Compensation.** Employee's compensation shall be:

a.  Bi-Weekly base salary is $5,769.23. Employee's base salary shall be subject to annual review.

b.  Leasing Co will create a Performance Bonus pool for its employees equal to 10% of Leasing Co's pretax net income less an overhead allocation to be determined by PBM and Leasing Co from time to time. Employee will participate in the Performance Bonus pool. Leasing Co's Board of Directors will award bonuses according to criteria it will establish.

c.  Employee shall receive an attorney's fee allowance of up to $5,000 upon signing this Agreement to reimburse Employee for attorney's fees incurred in connection with this Agreement.

d.  Salary and bonus and all other compensation to Employee will be subject to withholding of all taxes and deductions for insurance contributions, etc.

- 2 -

F5154g.597
3:03/30/98

4. **Benefits.**

a. While Employee is employed by Leasing Co, and subject to Leasing Co's right to modify or terminate any benefit plan or program, Employee shall be eligible for the standard employee benefits offered to PBM officers, subject to the terms of each plan.

b. Employee will receive "Change in Control" Agreements in the form attached.

5. **"Imputed Interest."**

5.1. The "Determination Date" is the earliest to occur of the following events:

a. Leasing Co terminates Employee's employment for a reason other than cause;

b. Employee terminates his employment with Leasing Co at any time after the 3rd anniversary of the Commencement Date, unless Employee terminates at a time when Leasing Co has grounds to terminate Employee for "cause" pursuant to *Paragraph 6.3*, in which case Employee's termination shall be deemed to be for "cause" pursuant to *Paragraph 6.3* and shall be governed by *Paragraph 5.7* instead of this Paragraph;

c. At PBM's request while Employee is employed by Leasing Co, at any time after the 8th anniversary of the Commencement Date; or

d. At Employee's request while Employee is employed by Leasing Co, upon a "Change in Control" of PBM. "Change in Control" is defined in Paragraph 2(b) of the attached Change in Control Agreements.

5.2. Within 45 days after the Determination Date, PBM will make a payment to Employee as if Employee were the equity owner of 25% of Leasing Co (the "Imputed Interest") and PBM were purchasing such Imputed Interest. The Imputed Interest will have a deemed value equal to 25% of the "Formula Price" of Leasing Co determined in accordance with *Exhibit A*, reduced, if necessary, pursuant to *Paragraph 5.3*. At Employee's request, PBM will make the payment to a rabbi trust. Thereafter, the Imputed Interest shall terminate and be of no further force or effect.

5.3. In the event that the aggregate payments or benefits to be made or afforded to Employee, including, but not limited to, the payment for Employee's Imputed

F5154g.597
3:03/30/98

Interest, which are deemed to be parachute payments as defined in Section 280G of the Internal Revenue Code of 1986, as amended, ("Section 280G") or any successor thereof, (the "Termination Benefits") would be deemed to include an "excess parachute payment" under Section 280G, such Termination Benefits shall be reduced to an amount which is $1.00 less than 3 times Employee's "base amount," as determined in accordance with Section 280G. The allocation of the reduction among Termination Benefits shall be determined by Employee.

5.4. If Employee's Imputed Interest payment is reduced pursuant to *Paragraph 5.3*, Employee may require PBM to sell its interest in Leasing Co to Employee at a price equal to 75% of the "Formula Price" determined in accordance with *Exhibit A*. If Employee wishes to purchase PBM's interest, Employee shall notify PBM in writing within ~~10~~ 30 days after Employee is notified that his Termination Benefits have been reduced and shall pay for PBM's interest in cash within ~~30~~ 180 days thereafter.

5.5. Prior to the 3rd anniversary of the Commencement Date and only while Employee is employed by Leasing Co, PBM will not dispose of its interest in Leasing Co. If PBM wishes to dispose of its interest in Leasing Co on or after the 3rd anniversary of the Commencement Date and only if Employee is then employed by Leasing Co, PBM shall first offer in writing to sell its interest in Leasing Co to Employee at a price equal to 75% of the "Formula Price" determined in accordance with *Exhibit A*. If Employee wishes to purchase PBM's interest at the offered price, Employee shall notify PBM of Employee's decision in writing within 30 days after receipt of the offer and shall pay for PBM's interest in cash within 180 days thereafter. In the event the offer to sell has not been accepted within the 30-day period, or payment is not made in full within 180 days thereafter, PBM may sell Leasing Co to any third party on terms, including credit terms, and subject to conditions satisfactory to PBM in its sole discretion. From the gross proceeds of sale, PBM shall first deduct all expenses of sale. Then, in lieu of the payment described in *Paragraph 5.2*, PBM shall pay 25% of the net proceeds of sale to Employee, as and when the proceeds are received by PBM, reduced, if necessary, pursuant to *Paragraph 5.3*, and thereafter the Imputed Interest shall terminate and shall be of no further force or effect. At Employee's request, PBM will make the payment to a rabbi trust.

5.6. The costs, if any, of the transfer of PBM's interest in Leasing Co to Employee pursuant to *Paragraphs 5.4 or 5.5* shall be borne 25% by Employee and 75% by Leasing Co.

5.7. If Employee's employment with Leasing Co terminates for cause pursuant to *Paragraph 6.3*, then the Imputed Interest shall terminate and shall be of no further force or effect and Employee shall not be entitled to any payment by Leasing Co pursuant to *Paragraph 5.2*.

- 4 -

F5154g.597
3:03/30/98

5.8. The Imputed Interest is not transferrable, may not be assigned, pledged or hypothecated in any way, and shall not be subject to execution, attachment or similar process. Upon any attempt to transfer the Imputed Interest or to assign, pledge, hypothecate or otherwise dispose of the Imputed Interest, or upon the levy of any attachment or similar process upon the Imputed Interest, the Imputed Interest shall immediately terminate and become null and void.

6. **Termination.**

6.1. In the event Employee's employment with Leasing Co is terminated by Leasing Co for a reason other than "cause" as defined in *Paragraph 6.3*, Leasing Co agrees to provide, and Employee agrees to accept, as the sole and exclusive remedy (together with any payment due under *Paragraph 5.2*) for the termination of his employment without cause, the following severance benefits and arrangements:

   a. Continuing bi-weekly payments of Employee's base salary for the following periods: 6 months if termination occurs prior to the 3rd anniversary of the Commencement Date; 1 year if termination occurs thereafter.

   b. Any benefits Employee has purchased prior to termination will be continued for 6 months if termination occurs prior to the 3rd anniversary of the Commencement Date, 1 year if termination occurs thereafter, if permitted under the terms of any applicable insurance policy.

As a condition to receiving that severance compensation, Employee agrees to make no other claim against Leasing Co.

6.2. If Employee decides to terminate Employee's employment with Leasing Co, Employee agrees to:

   a. Provide Leasing Co with 90 days prior written notice;

   b. Make no public announcement concerning Employee's departure prior to Employee's termination date without the consent of Leasing Co; and

   c. Continue to perform faithfully the duties assigned to Employee on the date of such notice (or such other duties as Leasing Co may assign to Employee) until Employee's termination date.

F5154g.597
3:03/30/98

This notice period is for the exclusive benefit of Leasing Co, and does not confer any employment obligation on Leasing Co. Leasing Co may elect, in its sole discretion and for any reason, to terminate Employee's employment, either immediately or at any point during the 90 day period. Upon Employee's termination of his employment, or Leasing Co's termination of Employee's employment during the 90-day period, Employee shall be entitled only to the payment of the base salary earned and benefits accrued under the terms of the employee benefit plans together with any payment due to Employee pursuant to *Paragraph 5.2*.

6.3. If Employee is terminated for "cause" by Leasing Co, Employee will not be eligible for any benefits under this Agreement except COBRA or as required by other law. Termination for "cause" shall be deemed to occur if Employee dies or if Leasing Co terminates Employee because of a material loss to Leasing Co caused by Employee's willful, intentional and continued failure to substantially perform stated duties (other than such failure resulting from incapacity due to physical or mental illness), personal dishonesty, willful violation of any law, rule, regulation (other than traffic violations or similar offenses) or final cease and desist order. For purposes of this *Paragraph*, no act, or the failure to act, on Employee's part shall be "willful" unless done, or omitted to be done, not in good faith and without reasonable belief that the action or omission was in the best interest of Leasing Co.

6.4. Except as otherwise specifically set forth in this Agreement, all further obligations of the parties under this Agreement, including, without limitation, PBM's obligations under *Paragraph 5.5*, will terminate upon termination of Employee's employment with Leasing Co, except that the parties' obligations in *Paragraphs 5.2, 5.3, 5.4, 5.6, and Section 7* shall survive.

7. **Restrictive Covenants.**

7.1. During the term of this Agreement and for the period stated in *Paragraph 7.1(f)* after termination of Employee's employment with Leasing Co, Employee agrees not to do any of the following, either as an owner, stockholder, lender, partner, co-venturer, director, officer, employee, agent, consultant, representative, or in any other manner or capacity, directly or indirectly, without the prior written consent of Leasing Co:

a. Engage or participate in any business activity within the "Restricted Areas" which is directly competitive with Leasing Co's business as conducted upon termination of Employee's employment with Leasing Co. "Restricted Areas" means the entire States of Pennsylvania and Maryland and those counties in states or jurisdictions in which Leasing Co conducts any business during the term of this Agreement.

- 6 -

F5154g.597
3:03/30/98

b. Become interested in any person or entity engaged in any business within the Restricted Areas that is directly competitive with the business of Leasing Co as conducted upon termination of Employee's employment with Leasing Co. Employee may hold not more than 1% of the outstanding securities of any class of any publicly-traded company so engaged.

c. Other than on behalf of Leasing Co during Employee's employment by Leasing Co, solicit or accept business within the Restricted Areas from any of Leasing Co's customers, or solicit or accept customers from any of Leasing Co's sources of referral. "Leasing Co's customers" means any person, corporation or other entity to which Leasing Co is providing financing or other leasing services on the date of Employee's termination of employment with Leasing Co, or to which Leasing Co provided such services during the 1 year period preceding Employee's termination. "Leasing Co's sources of referrals" means any person or corporation or other entity which has referred a customer or customers for the purpose of making a loan or lease from Leasing Co prior to the termination of Employee's employment with Leasing Co.

d. Influence or attempt to influence any supplier, referral source, customer or potential customer of Leasing Co to terminate or modify any written or oral agreement or course of dealing with Leasing Co.

e. Influence or attempt to influence any person to either terminate or modify his or her employment with Leasing Co, or employ or become interested in any person or entity who employs any person employed by Leasing Co at any time during the 6 month period preceding Employee's termination of employment with Leasing Co.

f. If Employee is terminated for "cause" by Leasing Co, the restrictive period for the purposes of *Paragraph 7.1* shall be 3 years. If Employee terminates Employee's employment with Leasing Co, the restrictive period for the purposes of *Paragraph 7.1* shall be 1 year. If Employee's employment with Leasing Co is terminated by Leasing Co for a reason other than "cause" as defined in *Paragraph 6.3*, the restrictive period for the purposes of *Paragraph 7.1* shall be: 6 months if termination occurs prior to the 3rd anniversary of the Commencement Date; 1 year if termination occurs on or after the 3rd anniversary of the Commencement Date, but prior to the 5th anniversary of the Commencement Date; 2 years if termination occurs on or after the 5th anniversary of the Commencement Date, but prior to the 8th anniversary of the Commencement Date; 3 years if termination occurs on or after the 8th anniversary of the Commencement Date.

7.2. Upon any termination of employment, Employee agrees to refrain from using any confidential or proprietary information obtained through Employee's employment with

- 7 -

P5154g.597
3:03/30/98

Leasing Co. Employee's obligations shall not apply to any information which Employee demonstrates was in Employee's possession prior to the disclosure by Leasing Co; is or hereafter becomes part of the public domain through no fault of Employee; or that Employee receives from a third party who was under no obligation of confidence to Leasing Co regarding the same. Employee agrees to refrain from making any statements or comments of a defamatory or disparaging nature to third parties regarding Leasing Co or its affiliates, officers, directors, personnel or products.

       7.3. If Employee breaches any of Employee's obligations in this Section, Employee agrees that Leasing Co may enforce this Agreement by seeking an injunction, as well as pursuing all other remedies, and Employee agrees to pay all of Leasing Co's attorneys' fees and costs incurred in such enforcement. If any provision of this Section shall be held to be invalid or unenforceable, the remaining provisions shall continue to be valid and enforceable. If any provision of this Section relating to the time period and/or the areas of restriction shall be declared by a court of competent jurisdiction to exceed the maximum time period or areas such court deems reasonable and enforceable, the time period and/or areas of restriction deemed reasonable and enforceable by the court shall become the maximum time period and/or areas.

       **8.**    **Broker Fee.** Upon Employee's signing this Agreement, PBM will pay a fee of $75,000 to Kropschot Financial Services. Employee represents that this is the only broker fee due upon consummation of this Agreement.

       **9.**    **Miscellaneous.**

       9.1. The invalidity or unenforceability of any particular provision or provisions of this Agreement shall not affect the other provisions hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions had been omitted.

       9.2. This Agreement constitutes the full and complete understanding and agreement of the parties, supersedes all prior representations, understandings and agreements as to Employee's employment by Leasing Co and cannot be amended in any respect, without the written consent of the parties hereto, except that Leasing Co reserves the right in its sole discretion to make changes at any time to the other documents referenced in this Agreement.

       9.3. No waiver of any right or remedy under this Agreement shall be binding on any party unless it is in writing and is signed by the party to be charged. No such waiver of any right or remedy under any term of this Agreement shall in any event be deemed to apply to any subsequent default under the same or any other term.

F5154g.597
3:03/30/98

9.4. No amendment, modification or termination of this Agreement shall be binding on any party unless it is in writing and is signed by the party to be charged.

9.5. Nothing expressed or implied in this Agreement is intended or shall be construed to give any person other than the parties any rights or remedies under this Agreement.

9.6. Where this Agreement authorizes or requires a payment or performance on a Saturday, Sunday or public holiday, such payment or performance shall be deemed to be timely if made on the next succeeding business day.

9.7. This Agreement shall be deemed to have been prepared jointly by the parties. Any ambiguity herein shall not be interpreted against any party hereto and shall be interpreted as if each of the parties had prepared this Agreement.

9.8. In this Agreement, the captions and section numbers appearing are inserted only as a matter of convenience. They do not define, limit or describe the scope or intent of the provisions of this Agreement.

9.9. Any notice, request or other communication required or permitted to be given under this Agreement shall be in writing and deemed to have been given properly when delivered in person, or when sent by telecopy or other electronic means and electronic confirmation of error free receipt is received, or two days after being sent by certified or registered United States mail, return receipt requested, postage prepaid, addressed to the party at the address set forth at the beginning of this Agreement. Any party may change its address for notices in the manner set forth above.

9.10. This Agreement may be executed in any number of counterparts, all of which shall constitute one and the same instrument, and any party hereto may execute this Agreement by signing and delivering one or more counterparts.

9.11. The validity, terms, performance and enforcement of this Agreement shall be governed by those internal laws of the State of Maryland which are applicable to agreements which are negotiated, executed, delivered and performed solely in the State of Maryland.

9.12. This Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of PBM. Leasing Co shall join in this Agreement upon its formation.

F5154g.597
3;03/30/98

9.13.  Employee may not assign Employee's rights or duties under this Agreement without the prior written consent of PBM.

IN WITNESS WHEREOF, the parties have executed this Agreement under seal as of the day and year first above written.

PROVIDENT BANK OF MARYLAND

By: _____(SEAL)
    John F. Novak, Group Manager

DAVID MCCARTHY

_____(SEAL)
David McCarthy

- 10 -

FS154g.597
3:03/30/98

## Exhibit A

The "Formula Price" of Leasing Co from time to time shall be 85% of the average of the price/earnings ratios of PBM's peer group of banks, *i.e.*, banks of asset size similar to PBM, included in the most recent edition of Keefe Bruyette & Woods' quarterly report multiplied by "Leasing Co's Earnings" as defined in this Exhibit A. Prior to the 3rd anniversary of the Commencement Date, "Leasing Co's Earnings" means total after tax net income of Leasing Co during the 36 months prior to determination (or the number of months of Leasing Co's corporate existence if less than 36) divided by 36 (or the number of months of Leasing Co's corporate existence if less than 36) and then multiplied by 12. On and after the 3rd anniversary of the Commencement Date, "Leasing Co's Earnings" means total after tax net income of Leasing Co during the 24 months prior to determination divided by 24 and then multiplied by 12. Leasing Co's total after tax net income shall not be affected by accruals for minority interests in subsidiaries. In determining net income, the books of Leasing Co shall be controlling. For this purpose, the last regular audit of the books prepared by Leasing Co's certified public accountant shall be accepted as correct, and shall be adjusted by the accountant for the operations from the date of the audit to the date of determination. If any dispute shall arise as to the net income of Leasing Co, its accountant shall determine that amount in accordance with the above. The accountant's certified determination shall be conclusive for all purposes and upon all parties. If the Keefe Bruyette & Woods' quarterly report becomes unavailable, the parties jointly shall choose another similar index.